## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHARLES GIANETTI,
     Plaintiff,

     v.

TEAKWOOD, LTD, et al.,
     Defendants.

No. 3:18-cv-542 (SRU)

## <u>RULING ON MOTION TO DISMISS</u>

Charles Gianetti, a Connecticut resident who is proceeding *pro se*, filed the instant fourteen-count suit against Teakwood, Ltd. ("Teakwood"), David Houze, Todd Fentress, 256 Enterprises, Inc. ("256 Enterprises"), Heritage Resources, Inc. ("Heritage Resources"),[1] Jack D'Aurora, and Robert Behal (collectively, "Defendants"). Gianetti was formerly a limited partner of Teakwood's predecessor entity, Discovery 76, and now challenges Defendants' handling of the dissolution of Discovery 76 in 2003.

The case was initially dismissed for lack of personal jurisdiction. Following the Second Circuit's decision remanding the case for further consideration of various issues, Defendants filed a second motion to dismiss, arguing that: (1) they did not commit any tortious acts sufficient to confer jurisdiction over them under Connecticut's long-arm statutes; (2) the exercise of jurisdiction would be inconsistent with due process; (3) *res judicata* bars the action; and (4) the amended complaint fails to state a claim against Behal and D'Aurora upon which relief can be granted.[2]

---

[1] Although the complaint refers to this defendant as "Heritages Resources," it appears that the correct spelling of the defendant's name is "Heritage Resources." I therefore refer to the defendant as Heritage Resources throughout the opinion.

[2] Although Defendants move to dismiss the case on the basis of *res judicata*, the substance of their argument illustrates that they intended to refer to claim preclusion rather than both claim preclusion and issue

For the reasons that follow, I agree with Defendants that Gianetti has failed to make a *prima facie* showing that Behal, D'Aurora, 256 Enterprises, or Fentress engaged in tortious conduct giving rise to jurisdiction in Connecticut, and that each claim is barred by claim preclusion. The motion to dismiss is therefore **granted**.

## I.     Standard of Review

### A.   Rule 12(b)(2)

A plaintiff bears the burden of showing that the court has personal jurisdiction over each defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). Where, as here, there has been no discovery on jurisdictional issues and the court is relying solely on the parties' pleadings and affidavits, the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).

In diversity cases, courts apply the forum state's law to determine whether the court has personal jurisdiction over a defendant. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985). "Connecticut utilizes a familiar two-step analysis to determine if a court has personal jurisdiction. First, the court must determine if the state's long-arm statute reaches the foreign corporation. Second, if the statute does reach the corporation, then the court must decide whether that exercise of jurisdiction offends due process." *Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 81 (2d Cir. 1995).

### B.   Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

---

preclusion. Accordingly, I address only whether the claims are barred by claim preclusion. *See Doe ex rel. Doe v. Jackson Local Sch. Sch. Dist.*, 422 F. App'x 497, 500–02 (6th Cir. 2011) (taking a similar approach).

2

Procedure Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

II.    **Background**

    A.    <u>Factual Allegations</u>[3]

Established in 1975, Discovery 76 owned parcels of real estate in and around Columbus,

Ohio that contained housing units, the residents of which received rental subsidies from the U.S.

Department of Housing and Urban Development.  *See* Am. Compl., Doc. No. 6, at ¶¶ 13, 14.  In

1976, Gianetti, a Connecticut resident, became a limited partner of Discovery 76.  *See id.* at ¶ 13,

15.  He obtained his partnership interest as an investment and tax shelter sold through Shearson

Hayden Stone, a brokerage company with an office in Greenwich, Connecticut.  *See id.*

Around 1984, David Houze, an Ohio resident, became the general partner of Discovery

76.  *See id* at ¶ 16.  According to Article 21b of Discovery 76's Amended and Restated

Agreement of Limited Partnership ("the Limited Partnership Agreement"), unanimous consent of

the limited partners was necessary for the general partner to resign before the tenth anniversary

of the "Final Endorsement."  *See id.*  Houze, however, did not receive unanimous consent as was

required.  *Id.*

In 1994, a proposal to dispose of Discovery 76 by part sale, part donation to a charitable

organization was presented to the limited partners.  *Id.* at ¶ 20.  The scenario would have

provided the greatest benefit to the limited partners, based on an estimate of potential appraised

value, yielding a net federal tax benefit of $51,258 per partner and resulting in the termination of

the partnership.  *See id.*  No further action was taken on that proposal.  *Id.*

In 1995, Houze withdrew as the general partner and formed Medallion-Discovery, an

Ohio LLC that ultimately replaced him as the general partner of Discovery 76.  *See id.* at ¶ 21.

At the time, Article 21(b) of the Limited Partnership Agreement allowed the resignation of any

---

[3] The facts are drawn primarily from the amended complaint, and for purposes of the present motion, I assume them to be true and draw all reasonable inferences in Gianetti's favor.  *See Ashcroft,* 556 U.S. at 678–79.

general partner with the written consent of 80% in interest of the limited partners, provided that the general partner seeking to resign found a substitute general partner that was satisfactory to not less than 80% in interest of the limited partners. *Id*. Although Houze did not receive approval of 80% in interest of the limited partners as required, he falsely claimed that a sufficient number of limited partners had consented. *See id.*

In March 1999, Medallion-Discovery, through its then-president, Houze, circulated a letter to the Discovery 76 limited partners recommending a transfer of ownership to a charitable organization for tax reasons. *See id*. at ¶ 24. No further action was taken on the proposal. *Id*.

Houze circulated another letter on October 8, 2000, proposing a termination of the partnership as part of a "tax free exchange," which he assured would "preserve all or most of your tax basis well into the future deferring your ordinary income recognition to a future capital gain." *Id*. at ¶ 25. Around the time of the proposal, Houze did not have an appraisal of the Discovery 76 properties. *See id*. at ¶ 50.

Consent forms accompanied the October 8, 2000 letter. *See id*. at ¶ 29. Although the forms were issued pursuant to Section 21b of the Limited Partnership Agreement, which required at least 80% in interest of the limited partners for approval, Section 14e appears to have been the operative provision. *See id*. at ¶¶ 27, 29. That provision required the consent of at least 60% in interest of the limited partners to dispose of the partnership. *See id*. at ¶ 27.

Other viable options to dispose of Discovery 76 were not pursued, and Gianetti's efforts to persuade Discovery 76 to sell its assets were unsuccessful. *See id.* at ¶¶ 26, 41. Although only eight of the twenty-three limited partners in interest consented to the 2000 proposal—and therefore the threshold level of support was not reached under either section 14e or 21b—Discovery 76 was terminated through a merger with an LLC known as Teakwood, Ltd. in 2003

(the "2003 Transaction").  *See id.* at ¶¶ 22, 31.  The general partner represented that Teakwood would work with non-profits to maintain and/or dispose of low income housing.  *See id*. at ¶ 26. The limited partners were advised that the recapture of taxable income from previous tax benefits would be delayed for at least 15 years and that their ownership interests in Teakwood were "worthless."  *See id.* at ¶ 26.  Gianetti's ownership interest in Teakwood is presently of "little value."  *Id*. at ¶ 43.

Six years later, on August 5, 2009, Teakwood wrote Gianetti a letter, which was signed by Managing Member, Heritage Resources, Inc.  *See id*. at ¶ 33.  Referring to a "pending transaction," the letter stated, among other things:  "At the time you were informed that sufficient authorizations from other limited partners had been received which would allow the transaction to proceed."  *Id*.

On July 25, 2010, the Behal Law Group, which represented Discovery 76 in the termination negotiations, wrote Gianetti's counsel a letter that was signed by Attorney Jack D'Aurora.  *See id*. at ¶ 34; *see also* Doc. No. 16, at 48.  Referring to Discovery 76, the letter read:  "The market value of the project as confirmed by HUD and independent appraisals, was significantly below the existing first mortgage balance."  Am. Compl., Doc. No. 6, at ¶ 34. According to Gianetti, that representation was false; Houze had previously stated that Defendants possessed no appraisals and, further,"[n]o market value of the project as confirmed by HUD or independent appraisals of Discovery 76 existed around the time of the 2000 proposal."  *Id*. at ¶¶ 35, 36.  D'Aurora's letter also stated that, "[d]uring the process, approvals from partners were obtained in order to consummate the transaction, and such approvals and the authority for them were heavily scrutinized by experts and counsel for the buyer."  *Id*. at ¶ 37.

In another letter dated May 2, 2011, D'Aurora wrote, "Does he understand that the transaction was approved by over 60% of the limited partners?  I understand that Dr. Gianetti believes that the general partner did not have the authority to dissolve Discovery 76 in the way that has occurred, but I disagree."  *Id*. at ¶ 38.

At an unspecified time, Gianetti requested the names, addresses, and telephone numbers of the members of Teakwood, but Defendants failed and refused to furnish such information.  *Id*. at ¶ 42.  They also have not disclosed the amount of legal fees paid by Discovery 76 to the Behal Law Group.  *See id.*

1. *The Ohio Actions*[4]

a. *Gianetti I*

In December 2011, Gianetti filed suit in the Court of Common Pleas of Franklin County, Ohio against Teakwood and Houze ("*Gianetti I*").  *See* Ex. A, Doc. No. 13-2, at 1.  The complaint alleged that the defendants breached the Limited Partnership Agreement by providing the limited partners with an ownership interest in Teakwood rather than distributing the partnership assets *pro rata*.  *See id*. at 3.  The complaint pled one count for action of discovery and principally sought documents to evaluate potential claims arising out of the 2003 Transaction.  *Id*. at 4, 5.

Gianetti thereafter amended his complaint, adding claims for breach of contract (Count II), unjust enrichment (Count III), conversion (Count IV), accounting (Count V), breach of duty of loyalty (Count VI), breach of duty of care (Count VII), breach of fiduciary duty (Count VIII),

---

[4] Courts may take judicial notice of other court proceedings.  *See Bailey v. Interbay Funding, LLC*, 2018 WL 1660553, at *2 n.2 (D. Conn. Apr. 4, 2018) ("At the pleading stage, courts may take judicial notice of matters of public record such as pleadings and orders in another action.").

breach of duty of good faith and fair dealing (Count IX), and promissory estoppel (Count X). *See id*. at 7–14.

The defendants moved to dismiss the complaint, and on November 15, 2012, Judge Richard A. Frye granted in part and denied in part the motion. *Id*. at 15. Judge Frye dismissed the claims for action of discovery (Count I), unjust enrichment (Count III), conversion (Count IV), breach of duty of loyalty (Count VI), breach of duty of care (Count VII), breach of duty of good faith and fair dealing (Count IX), and promissory estoppel (Count X), but allowed the three remaining counts to proceed. *Id*. Gianetti thereafter voluntarily dismissed all claims. *See id.* at 18.

#### b. *Gianetti II*

Roughly a year and a half later, in March 2014, Gianetti filed a second suit in the Court of Common Pleas of Franklin County, Ohio, against Teakwood, 256 Enterprises, Heritage Resources, Inc., Houze, and Fentress ("*Gianetti II*"). *See* Doc. No. 13-2, at 20 (Ex. E). The complaint again asserted an action for discovery claim (Count I), alleging that the defendants had refused to supply the names and contact information of Teakwood's members. *Id*. at 25. It also raised claims for breach of contract (Count II) and breach of fiduciary duty (Count IV), both of which centered on the defendants' decision to distribute ownership interests in Teakwood rather than market Discovery 76's real estate for sale and distribute cash proceeds. *See id.* at 25–27.

The complaint additionally pled a claim of fraud (Count V) based on, *inter alia*, the defendants' representation that "the market value of the real estate formerly held by Discovery 76 was significantly below the existing first mortgage balance." *Id*. at 27–28. Further, it advanced claims for (a) disregard of business entity, that is, piercing the corporate veil (Count VI); (b) negligent misrepresentation (Count VII); and (c) successor liability (Count VIII). *Id*. at

29–31.  Lastly, it sought an accounting of "sales proceeds and/or contribution proceeds from the disposition of properties formerly held by Discovery 76, together with complete accounting for any and all benefits receive[ed] by and/or compensation paid to the named Defendants herein and their affiliates for the negotiation and consummation of the series of real estate transactions in 2003."  *Id*. at 26 (Count III).

Gianetti voluntarily withdrew his claims for discovery (Count I), negligent misrepresentation (Count VII), and breach of fiduciary duty (Count IV), and on July 25, 2014, Judge Frye dismissed the claim arising out of fraud (Count V) as time-barred.  *Id*. at 35.  In January 2015, Judge Frye issued a decision granting the defendants' motion for partial summary judgment with respect to Gianetti's claim for disregard of business entity (Count VI).  *Id*. at 33–37.  Two months later, on March 17, 2015, the case proceeded to a bench trial and, at the conclusion of Gianetti's case, Judge Frye granted the defendants' motion for involuntary dismissal.  *See id*. at 40.  Judgment was entered on all claims in favor of Teakwood, 256 Enterprises, Heritage Resources, Houze, and Fentress, and against Gianetti.  *Id*. at 47.

A written decision subsequently issued setting forth the factual findings and legal conclusions underlying the judgment.  *See id*. at 40.  The opinion, in relevant part, stated that "[a] question first raised at trial was whether sufficient consent forms ever were actually gathered by Discovery 76 to satisfy the contractual requirement…."  *Id*. at 42.  Judge Frye noted that "no credible evidence was presented showing that sufficient consents were not obtained," and weighed as credible Houze's testimony that 67% of limited partners signed the consent forms. *Id*. at 42–43.  Judge Frye added that, although "there was an incorrect reference in the consent form to ¶ 21 of the Partnership Agreement, that mistake is immaterial," and, further, "there is no

evidence any limited partner was ever misled by the inaccurate cross reference in the consent

form." *Id.*  Judge Frye concluded that the contract was therefore not breached in that respect.  *Id.*

Judge Frye further concluded that Gianetti introduced no evidence implicating Houze or

Fentress in any wrongdoing, and dismissed all claims asserted against them with prejudice.  *Id.* at

43.  He also ruled in favor of the defendants on Gianetti's breach of contract claim grounded on

Discovery 76's failure to pursue a different course of action in 2003.  *Id.* at 43–46.  In doing so,

Judge Frye reasoned that Gianetti failed to prove that any obligation owed to him under the

Limited Partnership Agreement was breached in 2003 or that he suffered damages as a result of

the 2003 Transaction.  See *id.*  Because all substantive claims were dismissed, Judge Frye also

dismissed the accounting claim and the derivative claim against Teakwood and Fentress.  *Id.* at

46–47.

The judgment was affirmed on appeal.  *Id.* at 49–60.

B.  Procedural History

Gianetti filed the instant case on March 30, 2018.  *See* Compl., Doc. No. 1.  On April 16,

2018, he filed an amended complaint—the operative complaint—against Teakwood, Houze,

Fentress, 256 Enterprises, Heritage Resources, D'Aurora, and Behal.  Am. Compl., Doc. No. 6.

The amended complaint principally challenges Defendants' representations that a sufficient

number of limited partners consented to the 2000 proposal.  *See id.*

The complaint pleads fourteen counts:  fraudulent concealment and misrepresentation

(Count I); conspiracy to commit fraud (Count II); conspiracy to commit fraud by non-disclosure

(Count III); negligent misrepresentation (Count IV); professional negligence (Count V); breach

of fiduciary duty (Count VI); breach of contract (Count VII); breach of the covenant of good

faith and fair dealing (Count VIII); negligent misrepresentation (Count IX); action for discovery

(Count X); accounting (Count XI); personal liability for damages (Count XII); disregard of business entity (Count XIII); and successor liability (Count XIV).

Defendants filed a motion to dismiss the complaint on August 13, 2018, which Gianetti opposed on September 24, 2018.  On March 25, 2019, I issued a ruling granting the motion to dismiss, reasoning that personal jurisdiction did not exist under Connecticut's long-arm statutes, Conn. Gen. Stat. §§ 52-59b and 33-929(f), because Gianetti did not allege attempts by any of the defendants to transact business in Connecticut.  *See* Doc. No. 34, at 4–6.  I further held that venue was improper.  *Id*. at 6.

Gianetti appealed, arguing, among other things, that personal jurisdiction was proper because the defendants (1) transacted business in Connecticut and (2) engaged in tortious acts in the state.  *See* Doc. No. 39, at 2.  On April 17, 2020, the Second Circuit issued a summary order affirming with my ruling that the complaint did not sufficiently plead that Defendants transacted business in the state within the meaning of Connecticut's long-arm statute, but remanding on the ground that Gianetti's latter argument merited further analysis.  *Id.* at 2–4.  The Court elaborated:

> Gianetti argues that he made the necessary showing of a tort committed in Connecticut in his affidavit in opposition to the motion to dismiss, which alleged that the defendants mailed him documents containing false or misleading representations and attached numerous letters as exhibits. Alleged misrepresentations such as these may, in some circumstances, constitute tortious conduct within Connecticut permitting the exercise of personal jurisdiction.

*Id*.  "Without expressing a view as to the sufficiency of the allegations," the Court remanded for consideration of (1) "whether Gianetti has established a *prima facie* showing of personal jurisdiction on this basis;" (2) "whether the exercise of such jurisdiction would comport with due process;" and (3) "whether, as defendants argue, the Ohio litigation constitutes a *res judicata* bar to Gianetti's tort claims."  *Id*. at 4.

11

The mandate was issued on May 29, 2020.  On June 2, 2020, I issued an order directing Defendants to file a new or renewed motion addressing the issues on which the Second Circuit remanded the case for further reconsideration.  Order, Doc. No. 40.  On June 22, 2020, Defendants filed a second motion to dismiss, and on July 6, 2020, Gianetti filed an opposition.  *See* Doc. Nos. 41, 42.  A hearing was held on September 17, 2020, and I took the motion under advisement.  *See* Doc. No. 46.

## III.   Discussion

### A.   Personal Jurisdiction

The question whether the exercise of personal jurisdiction is proper is governed by the law of the state in which the district court sits.  *See Southridge Partners II Ltd. P'ship v. SND Auto Grp., Inc*., 2019 WL 6936727, at *2 (D. Conn. Dec. 19, 2019).  In cases where federal jurisdiction is grounded on diversity of citizenship, Connecticut courts engage in a two-step inquiry to determine whether personal jurisdiction may be exercised over the defendants.  *See Bensmiller v. E.I. Dupont de Nemours & Co., State of La.,* 47 F.3d 79, 81 (2d Cir. 1995).  First, courts decide whether the exercise of jurisdiction is conferred by Connecticut's long-arm statutes.  *See id*.  If that question is answered in the affirmative, courts then assess whether the exercise of jurisdiction comports with the Due Process Clause.  *See id.*

#### 1.   *Connecticut's Long-Arm Statutes*

Section 52-59b provides, in relevant part, that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual, foreign partnership or foreign voluntary association . . . who in person or through an agent . . . commits a tortious act within the state, except as to a cause of action for

defamation of character arising from the act." [5]  Conn. Gen. Stat. § 52-59b(a)(2).  Section 33-929(f) also provides, in relevant part, that personal jurisdiction exists over every foreign corporation on any cause of action arising "out of tortious conduct in this state."  Conn. Gen. Stat. § 33-929(f)(4).

In this case, the threshold question is whether Gianetti has sufficiently established that Defendants engaged in tortious conduct in Connecticut permitting the exercise of personal jurisdiction.  For the reasons set forth below, I conclude that Gianetti has carried his burden with respect to Houze, Teakwood, and Heritage Resources, but not with respect to Behal, D'Aurora, 256 Enterprises, or Fentress.

 a. Houze, Teakwood, and Heritage Resources[6]

I first conclude that Gianetti has sufficiently established that Houze, Teakwood, and Heritage Resources engaged in tortious conduct within the state for the purposes of sections 52-59b and 33-929(f).  Connecticut courts have held that either section 52-59b or 33-929(f) is satisfied "when a nonresident commits a tortious act within the state by sending a tortious communication into the state."  *See Doe v. Ciolli,* 611 F. Supp. 2d 216, 221 (D. Conn. 2009) (addressing section 52-59b) (collecting cases); *Knipple v. Viking Commc'ns, Ltd.,* 236 Conn. 602, 610 (1996) ("False representations entering Connecticut by wire or mail constitute tortious conduct in Connecticut under [what is currently § 33–929(f)(4)].").

---

[5] Although the statute does not expressly refer to LLCs, a Connecticut appellate court has held that the provision applies to foreign LLCs.  *Matthews v. SBA, Inc.,* 149 Conn. App. 513, 545 (2014) ("we are convinced that our general long arm jurisdiction statute, § 52–59b, applies to foreign LLCs").

[6] At oral argument, Gianetti conceded that the court did not have an independent basis for personal jurisdiction arising out of Houze's alleged failure to obtain the requisite number of consents to become the general partner in 1984 and to withdraw as the general partner in 1995.  *See* Doc. No. 6, at ¶¶ 60, 61.  Accordingly, I do not address those allegations.

In this case, Gianetti has adequately demonstrated that Houze, Teakwood, and Heritage Resources mailed to him in Connecticut multiple letters that contained allegedly false representations.  For example, a letter dated September 1, 2003 from Houze and Heritage Resources, which is appended to Gianetti's initial opposition as Exhibit A-8, declared that the 2003 Transaction was "approved by the majority of our partners."  *See* Doc. No. 16, at 36. Moreover, in his amended complaint, Gianetti alleges that Teakwood sent him a letter dated August 5, 2009 that stated that "[a]t the time you were informed that sufficient authorizations from other limited partners had been received which would allow the transaction to proceed." *See* Am. Compl., Doc. No. 6, at ¶ 33.  Appended to his opposition as Exhibit A-13 is, presumably, the August 5, 2009 letter, which additionally provides that the 2003 Transaction "occurred . . . with the approval of the partners within the restraints and requirements of the Partnership Agreement of Discovery 76."  *See* Doc. No. 16, at 46.

The amended complaint explains in detail why the statements in the foregoing letters are believed to be false.  It elaborates that Houze previously testified that there were 23 limited partnership interests, that only 8 limited partners consented to the 2000 proposal, and that approval by at least 60% of interest in limited partners was required to proceed with any action to dispose of Discovery 76.  *See* Doc. No. 6, at ¶¶ 27, 30–31.  Moreover, in an affidavit appended to his motion, Gianetti affirms that both letters were sent to him at his Connecticut address.  *See* Doc. No. 16, at 14–15, at ¶¶ 9, 11.

Because Gianetti alleges that Houze, Heritage Resources, and Teakwood sent him letters that contained false representations, and because his affidavit makes clear that the letters were mailed to Connecticut, Gianetti has established a *prima facie* showing that those defendants engaged in tortious activity in Connecticut under Connecticut's long-arm statutes.  *See Ciolli,*

611 F. Supp. 2d at 221; *see also David v. Weitzman*, 677 F. Supp. 95, 97–98 (D. Conn. 1987) (concluding that the transmission of a fraudulent misrepresentation into the state by mail and phone established *a prima facie* case of tortious conduct in Connecticut sufficient to confer jurisdiction under Connecticut's long-arm statute); *Callahan v. Wisdom,* 2020 WL 2061882, at *4 (D. Conn. Apr. 29, 2020) ("At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.") (citing *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013)).  Accordingly, he has sufficiently established at this early stage that personal jurisdiction exists over Houze and Teakwood pursuant to section 52-59b and over Heritage Resources, Inc. pursuant to section 33-929(f).

Defendants argue that there is no basis on which to exercise jurisdiction over Houze because the fraud claim against him was previously dismissed in *Gianetti II*.  *See* Doc. No. 41-1, at 7–10.  I am unpersuaded, principally because contradictory evidence may not be credited at this early stage.  *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (noting that, if a "full-blown evidentiary hearing" is not held, "a *prima facie* showing suffices, *notwithstanding any controverting presentation by the moving party,* to defeat the motion") (emphasis added); *David v. Weitzman,* 677 F. Supp. 95, 98 (D. Conn. 1987) ("[W]hen a motion to dismiss is decided on the papers, [a] plaintiff need only show a prima facie case of jurisdiction, such showing being sufficient regardless of any controverting presentation by the party moving to dismiss.").

For the foregoing reasons, I conclude that Gianetti has made a *prima facie* showing of tortious conduct in Connecticut giving rise to personal jurisdiction over Houze, Teakwood, and Heritage Resources under Connecticut's long-arm statutes.

b.   Behal and D'Aurora

Gianetti, however, has failed to meet his minimal jurisdictional burden with respect to Behal and D'Aurora, the attorneys who allegedly served as counsel for Discovery 76 in negotiations leading to its termination.  At the start, I note that, even when drawing all reasonable inferences in favor of Gianetti, Gianetti has not presented any factual allegations illustrating that either Behal or D'Aurora was personally involved in the transmission of the allegedly misleading letters from Houze, Heritage Resources, or Teakwood discussed above.  *Cf. Nedgam Prods., LLC v. Bizparentz Found.,* 2010 WL 3257909, at *5 (D. Conn. Apr. 29, 2010) (holding that the plaintiff did not establish personal jurisdiction under section 52-59b(a)(1) when the defendant did not have "active and personal involvement" with the dissemination of the challenged communication).

Critically, moreover, none of the communications from either Behal or D'Aurora were mailed to Gianetti in Connecticut.  *See Knipple, Ltd.,* 236 Conn. at 610 ("False representations *entering Connecticut* by wire or mail constitute tortious conduct in Connecticut under [what is currently § 33–929(f)(4)]) (emphasis added).  For instance, the complaint alleges that, in a letter dated July 25, 2010, D'Aurora falsely wrote, "[t]he market value of the project as confirmed by HUD and independent appraisals was significantly below the existing first mortgage balance." *See* Am. Compl., Doc. No. 6, at ¶ 34.  In his affidavit, Gianetti elaborates that the letter was sent to Joseph Piccin, an attorney based in Ohio whom Gianetti had retained at the time.  *See* Doc. No. 16, at 15 ¶ 13.  The letter itself, appended to the opposition as Exhibit A-15, confirms that it was addressed to Piccin at an address in Columbus, Ohio.  *Id*. at 48.

Each of the other e-mails and letters appended to the opposition are likewise addressed to Piccin rather than Gianetti.  *See, e.g.,* Doc. No. 16, Ex. A-15; A-16; A-17; A-18; A-19; A-20. Those communications therefore do not support the argument that D'Aurora or Behal committed

"a tortious act within the state" under section 52-59b(a)(2).  *See Bentivegna v. Lall-Trail*, 2014

WL 4413220, at *4 (Conn. Super. Ct. July 24, 2014) ("[W]hen a plaintiff seeks to take advantage

of a longarm provision that requires the defendant to take action 'in' or 'within' the forum state,

communications sent to another jurisdiction, or to the world at large without specifically

targeting the defendant in the forum state, will not suffice.").

In his opposition to the first motion to dismiss, Gianetti also argued that Behal and

D'Aurora "participated in a conspiracy with their clients" to promote false claims regarding the

2003 Transaction, and that the court may therefore exercise jurisdiction over Behal and

D'Aurora under section 52-59b(a)(3).  *See* Doc No. 16, at 6–7.  Under that provision, jurisdiction

is extended to a non-resident who "commits a tortious act outside the state causing injury to

person or property within the state, except as to a cause of action for defamation of character

arising from the act, if such person or agent (A) regularly does or solicits business, or engages in

any other persistent course of conduct, or derives substantial revenue from goods used or

consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to

have consequences in the state and derives substantial revenue from interstate or international

commerce."  Conn. Gen. Stat. § 52-59b(a)(3).

Fatally, however, Gianetti has not put forth any allegations to suggest that D'Aurora or

Behal "regularly does or solicits business, or engages in any other persistent course of conduct,

or derives substantial revenue from goods used or consumed or services rendered, in the state,"

nor has Gianetti alleged that either of them "derives substantial revenue from interstate

commerce."[7]  *Id*.  The only relevant information that I can glean from the amended complaint is

---

[7] I also note that, in their affidavits accompanying the first motion to dismiss, Behal and D'Aurora affirmed that they do not solicit business or engage in any persistent course of conduct in Connecticut, nor do they derive any revenue from services rendered in Connecticut.  *See* Doc. No. 13-3, at 1; Doc. No. 13-4, at 1.  They further affirmed that they derived no substantial income from either interstate or international commerce.  *See id.*

that they practice in Ohio, formerly represented Discovery 76 (an Ohio limited partnership), and now represent Teakwood (an Ohio LLC).  *See* Am. Compl., Doc. No. 6, at ¶¶ 2, 8, 9, 13, 64. Gianetti has therefore failed to make a *prima facie* showing sufficient to give rise to personal jurisdiction over D'Aurora or Behal under section 52-59b(a)(3).  *See Ryan v. Cerullo*, 282 Conn. 109, 124 (2007) (concluding that the complaint did not sufficiently allege that a defending corporation derived "substantial revenue" from interstate commerce when the corporation received only "minimal fee revenues from persons or entities located in Connecticut," did not promote itself as a national firm, and was not "regularly engaged" in furnishing services on an interstate basis).

For the foregoing reasons, Gianetti has failed to sufficiently establish a *prime facie* case of jurisdiction over D'Aurora or Behal.

### c.   256 Enterprises and Todd Fentress

Lastly, I conclude that Gianetti has failed to adequately show that 256 Enterprises or Fentress engaged in tortious conduct within the meaning of Connecticut's long-arm statutes. Other than alleging that 256 Enterprises is one of the two managing members of Teakwood, the amended complaint does not set forth any allegations that suggest that 256 Enterprises was directly involved in any alleged wrongdoing.  The same goes for Fentress; the amended complaint merely alleges that he succeeded Houze as owner and principal of 256 Enterprises and Heritage Resources.  *See* Am. Compl., Doc. No. 6, at ¶ 7.  Accordingly, the complaint does not plead that either Fentress or 256 Enterprises was involved in the transmission of tortious communications into Connecticut, and Gianetti has thus not carried his *prima facie* burden with respect to either defendant under sections 52-59b or 33-929, respectively.  *Cf. Nedgam Prods., LLC.,* 2010 WL 3257909, at *5.

In sum, Gianetti's allegations are sufficient to satisfy the applicable long-arm statute based on tortious conduct within the State by Houze, Teakwood, and Heritage Resources, but not over Behal, D'Aurora, 256 Enterprises, or Fentress. I therefore proceed to the due process inquiry addressing Houze, Teakwood, and Heritage Resources only.

2. *Due Process*

If jurisdiction may be exercised under a state's long-arm statute, a court next determines whether the exercise of jurisdiction comports with federal due process. *See Metropolitan Life Ins. Co. v. Robertson-CECO Corp.,* 84 F.3d 560, 567 (2d Cir. 1996). The due process requirement for personal jurisdiction, as announced by the Supreme Court in its seminal decision *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), "protects a person without meaningful ties to the forum state from being subjected to binding judgments within its jurisdiction." *Id*.

The due process test encompasses two related inquiries: the "minimum contacts" inquiry and the "reasonableness" inquiry. *Id*. at 567. First, courts decide "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id*. Second, courts determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Id.* at 568 (citing *International Shoe*, 326 U.S. at 316). I address each prong in turn.

a. Minimum Contacts

The minimum contacts test asks whether the defendant has "certain minimum contacts" with the forum such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d

120, 127 (2d Cir. 2002) (citation omitted).  Either specific jurisdiction or general jurisdiction can

satisfy the requirement.  *Directory Assistants, Inc. v. LK Jordan & Assocs*., 2012 WL 12904159,

at *2 (D. Conn. Aug. 10, 2012).  When "the claim arises out of, or relates to, the defendant's

contacts with the forum"—in other words, when there is specific jurisdiction—"minimum

contacts exist where the defendant purposefully availed itself of the privilege of doing business

in the forum and could foresee being haled into court there."  *Bank Brussels Lambert*, 305 F.3d

at 127 (citation and quotation marks omitted).  General jurisdiction, on the other hand, may be

asserted regardless "of whether the claim arises from the defendant's forum contacts," but "only

where these contacts are continuous and systematic."  *Id.*

In the present case, I conclude that Gianetti has sufficiently established specific personal

jurisdiction with respect to Houze, Teakwood, and Heritage Resources.  First, their contacts with

Connecticut—in particular, their letters to Gianetti claiming that the 2003 Transaction was

approved by a majority of the partners—are, in my view, related to the claims levelled against

each of them.  For instance, the letters are clearly related to the fraudulent concealment and

breach of fiduciary duty claims advanced against Houze, which rest on the allegation that Houze

concealed the fact that Discovery 76 lacked the requisite number of approvals to move forward

with the 2000 proposal.  *See* Am. Compl., Doc. No. 6, at ¶¶ 51–59, 91.  The letters are also

related to the claim levied against Teakwood for successor liability, as well as the claim for

accounting,[8] each of which center on the 2003 Transaction.  *See id.* at ¶¶ 110, 117; *see also Bank

Brussels Lambert*, 305 F.3d at 127–28 (holding that the district court adopted "too narrow of a

view" of the relevant contacts with respect to specific jurisdiction, reasoning that, although the

---

[8] Because Gianetti does not specify the defendants against which he is bringing the claim for accounting, I presume he intends to assert the claim against all defendants.

contacts "may not have directly given rise to the plaintiff's cause of action, they certainly 'relate to' it").

Because they purposefully communicated to Gianetti in Connecticut, and because Gianetti's claims relate to, if not arise out of, the statements in those communications, Houze, Teakwood, and Heritage Resources should have reasonably anticipated being brought into court in Connecticut to answer for the truth of their statements. It would therefore not be "fundamentally unfair" to require those defendants to defend themselves in this court. *See Bank Brussels Lambert*, 305 F.3d at 128–29.

I note further that Defendants' reliance on the Second Circuit's opinion in *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016), is misplaced. There, the Court decided whether general jurisdiction—rather than specific jurisdiction—could be asserted over the defendant, and therefore applied the stringent test of whether the defendant's contacts with Connecticut were "continuous and systematic" enough to place it "essentially at home" in the state. *See id*. at 626–30. In this case, by contrast, the question whether there is general jurisdiction need not be reached because Houze's, Teakwood's, and Heritage Resources' contacts with Connecticut give rise to specific jurisdiction, as discussed above. For that reason, the minimum contacts test has been satisfied and *Brown* does not compel a conclusion to the contrary.

b. Reasonableness

Turning to the second part of the jurisdictional analysis—whether the assertion of jurisdiction is reasonable—I conclude that this prong, too, has been satisfied with respect to Houze, Teakwood, and Heritage Resources.

In evaluating reasonableness, courts consider the following factors:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Bank Brussels Lambert*, 305 F.3d at 129 (citation omitted).  Although "the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  *Metro. Life Ins. Co.,* 84 F.3d at 568 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)); *accord Ciolli*, 611 F. Supp. 2d at 224 (noting that the defendants bear the burden of proving a "compelling case that personal jurisdiction is unreasonable under the circumstances").

In this case, Defendants have not advanced any persuasive argument why litigating the case in Connecticut would pose an unreasonable burden on them.  Although Houze, Teakwood, and Heritage Resources are based in Ohio, and although they might not have any contacts with Connecticut, those facts are insufficient to offset the other factors that weigh in favor of jurisdiction.  *See Bank Brussels Lambert*, 305 F.3d at 129–30 ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because 'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'") (citation omitted).

Moreover, courts in this state have observed that Connecticut has "a strong interest in redressing injuries to its own residents."  *Proto v. Hamic*, 2011 WL 1992202, at *12 (Conn.

Super. Ct. May 10, 2011).  Gianetti is also a Connecticut resident who felt the brunt of the

alleged harm in the state and therefore "has a significant interest in obtaining convenient and

effective relief in Connecticut courts."  *Id.*; *Directory Assistants, Inc. v. LK Jordan & Assocs.*,

2013 WL 869671, at *4 (D. Conn. Mar. 7, 2013) ("Plaintiff has an obvious interest in obtaining

convenient and efficient relief against defendant in this forum, and Connecticut has a strong

interest in adjudication of the tort claims asserted by a Connecticut corporation against an out-of-

state resident.").  Finally, Defendants have presented no argument why the fourth or fifth factors

cut in their favor.

      For the foregoing reasons, Defendants have not demonstrated that the exercise of

jurisdiction would be unreasonable.  Extending personal jurisdiction over Houze, Teakwood, and

Heritage Resources therefore comports with due process.

### B.  Claim Prelusion

      Ultimately, however, it is of no moment that there is personal jurisdiction over certain

defendants because claim preclusion bars all of Gianetti's claims in any event.[9]  The Full Faith

and Credit Act instructs that "judicial proceedings of any court of any [] State . . . shall have the

same full faith and credit in every court within the United States . . . as they have by law or usage

in the courts of such State . . . from which they are taken."  28 U.S.C. § 1738.  In determining the

---

[9] Gianetti cannot lose his case in state court and subsequently bring the same claims to federal court in hopes of securing a better outcome merely because there might be personal jurisdiction over the claims.  As I explain more fully below, that conduct falls squarely within the scope of what the Full Faith and Credit Act proscribes.

      I note further that, at oral argument, Gianetti maintained that a *res judicata* defense may not be raised in a Rule 12(b)(6) motion to dismiss and pointed to Ohio state court precedent in support of that proposition.  The case law on which Gianetti relies, however, applied Ohio procedural rules rather than the Federal Rules of Civil Procedure and is at odds with binding precedent.  *See AmBase Corp. v. City Investing Co. Liquidating Tr.*, 326 F.3d 63, 72 (2d Cir. 2003) ("[W]e can affirm the dismissal of a complaint for failure to state a claim based on the affirmative defense of res judicata if 'all relevant facts are shown by the court's own records,' of which we can take judicial notice.").  Because all relevant facts in this case have been set forth by court records, Gianetti's argument is without merit.

preclusive effect of a prior state court judgment, the Second Circuit applies the preclusion law of the rendering state. *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 87 (2d Cir. 2000). Accordingly, because the underlying state actions took place in Ohio, I apply Ohio preclusion law. *See King v. Bank of Am. NA*, 2019 WL 3292184, at *5 (N.D. Ohio June 19, 2019), *report and recommendation adopted sub nom. King v. Bank of Am., N.A.,* 2019 WL 3290333 (N.D. Ohio July 22, 2019).

Ohio applies an "expansive view of claim preclusion." *Demsey v. Demsey*, 488 F. App'x 1, 4 (6th Cir. 2012). A party seeking to invoke claim preclusion under Ohio law must establish the following four elements: (1) "a prior final, valid decision on the merits by a court of competent jurisdiction;" (2) "a second action involving the same parties, or their privies, as the first;" (3) "a second action raising claims that were or could have been litigated in the first action;" and (4) "a second action arising out of the transaction or occurrence that was the subject matter of the previous action." *Doe ex rel. Doe v. Jackson Local Sch. Sch. Dist.,* 422 F. App'x 497, 501 (6th Cir. 2011) (citation omitted). I address each element in turn.

### 1. *Final Decision on the Merits*

First, a prior, final decision on the merits was issued in *Gianetti II*. There, following a bench trial, the court rendered judgement against Gianetti and in favor of Teakwood, 256 Enterprises, Heritage Resources, Houze, and Fentress. *See id.* at 501 ("The judgment in Plaintiff's State Court Action is a final, valid decision by a court of competent jurisdiction."). Accordingly, the first element has been satisfied.

### 2. *Second Action Involving the Same Parties or their Privies*

Second, "application of res judicata requires the parties to the first action be identical to, or privies with, those in the second (precluded) action." *United States ex rel. Sheldon v.*

*Kettering Health Network*, 816 F.3d 399, 415 (6th Cir. 2016).  With the exception of D'Aurora and Behal, all the defendants named in the present action were defendants in *Gianetti II*.  The question before me therefore narrows to whether D'Aurora and Behal were in privity with the *Gianetti II* defendants.

Ohio courts have applied a "broad definition" in deciding whether a relationship between parties is close enough to invoke claim preclusion.  *United States ex rel. Sheldon*, 816 F.3d at 415 (citations omitted).  It is well-established that "'a principal-agent relationship' satisfies the privity requirement of [claim preclusion] where the claims alleged are within the scope of the agency relationship."  *Frazier v. Matrix Acquisitions, LLC*, 873 F. Supp. 2d 897, 902 (N.D. Ohio 2012) (citation omitted).  And because the relationship between a client and attorney is a "quintessential principal-agent relationship," *Comm'r v. Banks*, 543 U.S. 426, 427 (2005), Ohio courts have concluded that privity is satisfied in those circumstances for purposes of *res judicata, see Brown v. Fla. Coastal Partners*, 2015 WL 4205157, at *9 (S.D. Ohio July 10, 2015) (discussing issue preclusion).

With those principles in mind, I conclude that privity exists between D'Aurora and Behal on the one hand and the *Gianetti II* defendants on the other, largely because court records indicate that D'Aurora and Behal represented the *Gianetti II* defendants throughout the *Gianetti II* litigation.  The second element is therefore satisfied.

3.  *A Second Action Raising Claims That Were or Could Have Been Litigated in the First Action*

Third, the second action must raise claims that "were or could have been litigated in the first action."  *United States ex rel. Sheldon*, 816 F.3d at 416.  "As the 'could have' phrasing implies, this element concerns only the legal possibility of bringing the disputed claims in the previous action."  *Id*.

In this case, to the extent Gianetti did not previously raise the present claims in *Gianetti II,* Gianetti offers no cogent reason why he could not have done so.  Although the amended complaint alleges that Gianetti did not become aware that an insufficient number of limited partners consented to the 2000 proposal until around March 12, 2015*, Gianetti II* was ongoing at that time—indeed, the bench trial had not yet begun—and under Ohio Rule of Civil Procedure 18, a party "may join, either as independent or as alternate claims, as many claims, legal or equitable, as he has against an opposing party."  *See Jackson Local Sch. Sch. Dist.,* 422 F. App'x at 501 (citing Ohio R. Civ. P. 18(A)).  At any rate, court records evince that Gianetti vigorously litigated the claim that the defendants failed to garner the requisite level of approval to pursue the 2000 proposal during the bench trial in *Gianetti II*, and that Judge Frye ultimately considered and rejected the claim in his written decision.  *See* Doc. No. 41-3, at 61–72, 86–91; Doc. No. 13-2, at 42–43.  Gianetti's contention that Judge Frye denied his request to amend his complaint to add the claim is therefore unavailing, and the third element has been met.

### 4.  *Same Transaction or Occurrence*

Finally, the claim must also arise out the same "transaction, or series of connected transactions, out of which the [first claim] arose*. United States ex rel. Sheldon*, 816 F.3d at 417 (citation omitted).  "A transaction, or series of connected transactions" is defined as a "common nucleus of operative facts.'"  *Id.* at 418 (citation omitted).  Significantly, "this element does not require the claims in both actions to be identical."  *Id.* (citation omitted).  Claim preclusion instead "applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action (1) [t]o present evidence or grounds or theories of the case not presented in the first action, or (2) [t]o seek remedies or forms of relief not demanded in the first action."  *Id.*

Applying the foregoing principles, I conclude that all of the instant claims arise out of the same transaction or occurrence as those raised in *Gianetti II*.  I examine each claim in turn.

a.  Count I

The fraudulent concealment and misrepresentation claim against Houze (Count 1) is premised on the allegation that an insufficient number of partners approved the consummation of the 2000 proposal.[10]  As noted, during the bench trial in *Gianetti II*, Gianetti argued that the necessary level of support to proceed with the 2000 proposal was not obtained.  Although the claim in *Gianetti II* appeared to have been cloaked as a breach of contract claim rather than a tort claim premised in fraud, both claims share a common nucleus of operative facts.  And as the Sixth Circuit instructed, "[t]hat a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims." *Jackson Local Sch. Sch. Dist.*, 422 F. App'x at 501–02 (citation omitted).  I therefore conclude that Count I is based on the same transaction or occurrence as the breach of contract claim brought in *Gianetti II* and is barred by claim preclusion.

b.  Count II, III, IV, and V

I further conclude that the conspiracy to commit fraud, conspiracy to commit fraud by non-disclosure, negligent misrepresentation, and professional negligence claims against D'Aurora and Behal (Counts II, III, IV, and V, respectively) are barred by claim preclusion. Each claim rests on either (a) D'Aurora and Behal's representations that the market value of Discovery 76's properties was well below the existing first mortgage and that the requisite

---

[10] Gianetti clarified at oral argument that he was not bringing a claim based directly on the allegation that Houze failed to secure the requisite level of approval to become and later withdraw as the general partner.  Gianetti further affirmed that he was not, to his knowledge, harmed by that alleged conduct.  For those reasons, I presume that his claims do not rest on those allegations.

number of approvals was obtained to pursue the 2000 proposal, or (b) D'Aurora and Behal's failure to disclose the lack of property appraisals or the accurate number of approvals received. *See* Am. Compl., Doc. No. 6, at 10–13.

For the same reasons as discussed with respect to Count I, Counts II, III, IV, and V—to the extent they are based on misrepresentations or omissions regarding the number of votes cast in favor of the 2000 proposal—arise out of the same transaction or occurrence as the breach of contract claim that was adjudicated in *Gianetti II*.  Although the claim in *Gianetti II* was not brought against D'Aurora and Behal, it nonetheless "arise[s] from the same event and seek[s] to redress the same basic wrong."  *Astar Abatement, Inc.*, 2012 WL 481799, at *6 (citation omitted); *see also Lisboa v. City of Cleveland Heights,* 576 F. App'x 474, 476 (6th Cir. 2014) (holding that claims brought against different defendants arose out of a "common nucleus of operative facts" when "[t]he pattern of disruptive activity behind both suits is the same, and the alleged problem with the City's response is the same").

Further, to the extent Counts II, III, IV, and V are based on misrepresentations or omissions concerning the market value of Discovery 76's properties prior to the 2003 Transaction, they arise out of the same transaction or occurrence as the fraud clam in *Gianetti II*, which likewise challenged the representation that the "market value of the real estate formerly held by Discovery 76 was significantly below the existing first mortgage balance."  *See* Doc. No. 13-2, at 27–28.  Those claims, too, are precluded as a consequence.

c.   Counts VI, VII, VIII, IX, and XII

The breach of fiduciary duty, negligent misrepresentation, and personal liability claims against Houze (Counts VI, IX, and XII, respectively), as well as the breach of contract and breach of the covenant of good faith and fair dealing claims against Fentress and Houze (Counts

VII and VIII, respectively), are also barred for similar reasons.  To the extent those counts rest on the failure to obtain the threshold number of consent forms to proceed with the 2000 proposal, they are barred for the same reasons as discussed above.  To the extent they are premised on Houze's failure to investigate more lucrative options prior to the 2003 Transaction, they are also precluded because the breach of contract claim in *Gianetti II* was likewise centered on Houze's failure to pursue a different course of action in 2003.  The two sets of claims thus share a common nucleus of operative facts, and the claims now at issue are barred.

> d.   Count X

The instant complaint also lodges an action for discovery claim (Count X), presumably against all defendants, on the ground that the defendants "unreasonably refus[ed]" to provide Gianetti with the names and contact information of Teakwood members or with the consent forms surrounding the general partnership changes.  *See* Am. Compl., Doc. No. 6, at ¶¶ 107–09. Because the defendants' alleged refusal to supply certain information—specifically, the names and contact information of Teakwood's members—also gave rise to the action for discovery claim in *Gianetti II*, the two claims are logically related.  Indeed, the two claims would "form a convenient unit for trial purposes," because "the witnesses or proofs in [the instant] action would tend to overlap the witnesses or proofs relevant to the [*Gianetti II*]."  *United States ex rel. Sheldon*, 816 F.3d at 418 (citation omitted).  Count X is, as a result, barred on that basis.

> e.   Count XI

With respect to Count XI (accounting), Gianetti alleges that he is entitled to an accounting of "all transactions that occurred in the disposition and termination of Discovery 76." *See* Am. Compl., Doc. No. 6, at ¶ 110.  That allegation parallels the one underlying Count III in *Gianetti II*.  *See* Doc. No. 13-2, at Count III (alleging that Gianetti is entitled to "an accounting

of sale proceeds and/or contribution proceeds from the disposition of properties formerly held by Discovery 76, together with complete accounting for any and all benefits receive[d] by and/or compensation paid to the named Defendants herein and their affiliates for the negotiation and consummation for the series of real estate transactions in 2003"). Count XI is therefore logically related to the prior claim and precluded as well.

### f. Count XIII

Regarding Count XIII (disregard of business entity), the amended complaint alleges that Houze and Fentress by succession exercised such control over the corporate defendants such that there was no separate mind, will, or existence of their own. Am. Compl., Doc. No. 6, at ¶ 116. Because that same allegation gave rise to the disregard of business entity claim in *Gianetti II*, doc. no. 13, at 30, Count XIII is barred.

### g. Count XIV

Lastly, the amended complaint avers that Teakwood and Fentress are "liable in successor capacities because of the mergers that have taken place." Doc. No. 6, at 19, ¶ 117 (Count XIV). The *Gianetti II* complaint set forth that same allegation. *See* Doc. No. 13-2, at 31 ("Teakwood and Fentress are liable in successor capacities because of the mergers that have taken place"). For that reason, Count XIV arises out of the same transaction or occurrence as the one in *Gianetti II* and is also barred.

## IV. Conclusion

For the foregoing reasons, I dismiss the claims against Fentress, 256 Enterprises, D'Aurora, and Behal for lack of personal jurisdiction and further dismiss all claims as barred by

claim preclusion.[11]  The motion to dismiss (doc. no. 41) is therefore **granted**, and the Clerk is directed to close the case and enter judgment in favor of Defendants.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of February 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

---

[11] Because I dismiss the amended complaint on those bases, I do not address Defendants' arguments that Counts II, III, IV, and V should be dismissed for failure to state a claim.